*IN THE UNITED STATES DISTRICT COURT*
*FOR THE WESTERN DISTRICT OF MICHIGAN*
*SOUTHERN DIVISION*


JOSE ORTIZ,

              Plaintiff,

vs.                                          Case No: 1:21-cv-495


ROBERT NELMS,

              Defendant.
_____/


*MOTION FOR SANCTIONS*
*(Via Zoom Videoconferencing)*

*HELD BEFORE THE HONORABLE SALLY J. BERENS*
*U.S. MAGISTRATE JUDGE*
*Grand Rapids, Michigan*

*July 12, 2022*

APPEARANCES:
For the Plaintiff:    MR. HERMAN DANIEL HOFMAN
                      333 Bridge Street, NW
                      P.O. Box 352
                      Grand Rapids, MI 49501
                      (616) 336-6375

For the Defendant:    MR. KEVIN CHARLES MAJEWSKI
                      801 W Ann Arbor Trail
                      Suite 240
                      Plymouth, MI 48170


TRANSCRIBED BY:       Genevieve A. Hamlin, CSR-3218, RPR, CRR
                      Federal Official Court Reporter
                      128 Federal Bldg
                      315 W Allegan St
                      Lansing MI 48933
                      (517) 881-9582

Grand Rapids, MI

July 12, 2022

2:00 p.m.

*PROCEEDINGS*

THE COURT:  All right.  We are on the record in the United States District Court for the Western District of Michigan and speaking is United States Magistrate Sally Berens.

We're on the record in case 1:21-cv-495, Ortiz versus Nelms, and we are here today for a hearing on plaintiff's motion for sanctions against defendant and third-party Stawick CPA Group for their failure to comply with this Court's discovery order, which is ECF number 68.

Let's start with appearance of counsel.  For the plaintiff.

MR. HOFMAN:  Thank you, Your Honor.  Herman Hofman on behalf of plaintiff, Jose Ortiz.

MR. MAJEWSKI:  Good afternoon, Your Honor -- I'm sorry.

THE COURT:  That's okay.

MR. MAJEWSKI:  Good afternoon, Your Honor.  Kevin Majewski on behalf of the defendant.

THE COURT:  Good afternoon to you -- both of you.

All right.  As an initial matter, one thing that strikes me as problematic in our hearing today is that, Mr.

Hofman, you have asked for sanctions against both the defendant and the Stawick CPA Group.  There is obviously no appearance on behalf of the Stawick CPA Group so it would be inappropriate probably for me at this point to order any sanctions as against them, if I were to get there in the first place, which I'm not sure whether or not we'll get to that point or not.

Has this been served on them?  Are they aware of this hearing?  What is the status of that?

MR. HOFMAN:  I did serve the motion for sanctions on the Stawick CPA Group through e-mail correspondence, e-mail that I confirmed was the Stawick CPA Group's e-mail address. As to the notice of hearing, I don't recall serving that on Stawick, although I can check that here quick.

THE COURT:  All right.  Well, obviously they're not present, and I'm not going to move forward as against them in any way without their presence and ability to argue.  I'm not even sure that they know that they had a response that they could have made to this, et cetera, so in addition, on that front, I know that your motion indicated that you had requested additional documents from them, and I don't know whether you've received any additional production from them or not.

MR. HOFMAN:  No, Your Honor, I have not received any additional documents from Nelms or from the Stawick CPA Group.

THE COURT:  Okay.  Well, let's walk through -- there is a lot going on in the motion.  There are a number of different items.  I will tell you just as a matter of my own view, you know, every Court views sanctions as a last resort and is more interested in the ensuring of appropriate discovery in a case than in something punitive.  Some of the allegations you make strike me as stronger than others, and I want to make sure that each gets appropriate consideration.

It's also a little bit difficult to follow -- I think parties are sometimes so steeped in a case themselves that they forget that an outside observer of the case may not have the familiarity to entirely connect all of the dots that they're trying to put together, so what I'd like to do is walk through what you are requesting and the basis for that and then we'll hear from Mr. Majewski in addition and determine whether or not there is anything that we need to do as to each individual item.  Makes sense?

MR. HOFMAN:  Yes, Your Honor.

THE COURT:  In addition, I, of course, know that because of the nature of discovery motions, you've had an opportunity to file your motion.  Mr. -- is it Majewski?  Am I saying it correctly?

MR. MAJEWSKI:  Majewski or Majewski.

THE COURT:  Majewski.  We did this last time, too, but I will try to remember Majewski.  Mr. Majewski had an

opportunity to respond.  You haven't had an opportunity, Mr. Hofman, to respond to that, so, anyway, let's walk through it and in, if possible, as much of the same order as is in your motion as we can, so I think the first issue relates to the Virginia forest investment, correct?

MR. HOFMAN:  Yes, Your Honor.  And so that's the transaction records for -- so just a little bit by way of background.  There's the -- you know, our claim, again, is that the retirement savings of my client were transferred to Nelms who then used those funds to -- both for personal expenses, and so directly stole them, as well as indirectly stealing them by using them for business expenses, whether that was payroll or loans, cash infusions to other businesses he managed, or other expenses that he used for the broader scheme of obtaining other people's money and then funding his own personal ventures with that, and so the response of Nelms has been throughout this case that, no, I didn't take your money.  Your money was -- you actually bought partnership interests in a company called MGMC, LP, and that company decided to embark on certain investments, and you, Jose Ortiz, always knew about those investments and you knew where your money was going and what it was doing, and so in discovery we've been, well, let's -- our position has been let's put the cards on the table, let's see the financials of these companies you're saying the money was invested in, and let's

also see the transaction records that will show us where exactly this money went and what it was used for, not only the money itself but also the proceeds of those funds.  You know, when in -- an investment was made and then when it was sold later, because that happened a lot in this case, too, so one of those is this Virginia land, and what we've asked related to the Virginia land, Nelms says this land is owned by a company called Q-Consolidated of Virginia, and so we've asked for, one, the financials of Q-Consolidated of Virginia.  If this is a legitimate company, then there should be financials out there.  There should be account statements.  There should be balance statements that tell us what is this company doing, what is it worth, and those have not been produced, and we've been asking for them, and this was, again, the subject of our motion to compel previously and so we -- and I've listed in our motion several line items that have come to light in discovery.  For example, one is that Nelms says he made an initial contribution to Q-Consolidated of Virginia of $60,000 and so we've tried to -- we've tried to get documents related to this initial contribution.  Where did this money come from?  Is it someone else's money that Nelms is using?  Is it his own money?  Does he actually own an interest in Q-Consolidated?  And we haven't received that -- any transaction records related to that, and it's been requested in our discovery requests, request number 24, 44, 47, 48, 49, the same ones we

went over in the hearing on the motion to compel and the requests that this Court ordered to be responded to, and we haven't receive any documentation related to that.

Then the others are similar.  It's the --

THE COURT:  Well, I'm sorry, what I really intended more here was to start with the Virginia land -- forest land investment and let's walk through what in your view demonstrates that Mr. Nelms had those documents before and should have responded -- or should have produced them in response to a valid discovery request and then did not.  Can you walk me through -- because, you know, you -- in your motion you reference exhibits, but drawing the lines between them is not exactly -- it's not -- all of the building blocks are not exactly there, at least as is clear to me, and I want to make sure I understand exactly what the support is for the fairly serious allegations that you're making, so --

MR. HOFMAN:  Sure.  And so the -- if I'm understanding, Your Honor --

THE COURT:  So for the -- let's start with the Virginia forest land investment.

MR. HOFMAN:  Sure.

THE COURT:  Your statement is that Mr. Majewski represented that he didn't have any documentation relating to it, and then that there was a refinancing that you discovered of that forest land and then you said to him, okay, we know

about this refinancing, and then Mr. Majewski produced documents -- some documents related to that refinancing after that was requested.  Is that essentially -- do I have the timeline there correct?

MR. HOFMAN:  Yes, Your Honor, that's correct.  So before -- at the motion hearing and before documentation of this refinancing was never produced.  We never received it, and so then what happened is I called -- I sent a subpoena to Q-Consolidated of Virginia, and I didn't receive any response to it but later I did receive a phone call from the person who was listed as a resident agent of Q-Consolidated of Virginia, and he said, I own land adjacent to this Virginia forest land at issue, and he said, I have no idea what Q-Consolidated of Virginia is but I do know Nelms refinanced the --

THE COURT:  Wait, wait.  Hang on.  Back up for a second.  You said you sent a subpoena to Q-Consolidated of Virginia --

MR. HOFMAN:  Yes.

THE COURT:  -- didn't get a response, but that someone from Q-Consolidated then called you?

MR. HOFMAN:  Well, someone -- so we looked online and Q-Consolidated of Virginia's resident agent --

THE COURT:  The resident agent.

MR. HOFMAN:  He called me.  He called me, but he said, I'm not the resident agent of Q-Consolidated of

Virginia.

THE COURT:  Okay.  So he was listed as the resident agent but was -- he said, at least, I don't know anything about this company?

MR. HOFMAN:  Exactly.

THE COURT:  Okay.

MR. HOFMAN:  But he said I do -- I own land next to this Virginia forest land at issue, and I know who Robert Nelms is and I know that he refinanced a loan he had on that land previously, and the bank that he used was this Virginia Bank and Trust, now First National Bank.

THE COURT:  Okay.

MR. HOFMAN:  And, of course, my response was, this is news to me.  I've never heard of this before, so I called the contact he gave me at First National Bank, Virginia Bank and Trust --

THE COURT:  Okay.

MR. HOFMAN:  -- and that -- the contact there confirmed that, yes, Nelms had refinanced a loan he had on this land, and he said, I can't give you any documents at this time because I need permission from Nelms to give you these documents, and he has these documents, is what the bank told me, and so then I reached out to Mr. Majewski and informed him about my -- what I had found out, and then Mr. Majewski said, okay, you know, I'll talk to Nelms about it, and then around

the same time I think I sent a subpoena to First National Bank and received documents from them, and Mr. Majewski later supplemented their documents -- their document production with some documents related to this loan, too, which all tells me that obviously Nelms had these documents at the time of our motion to compel and it also confirms he didn't disclose them -- he didn't produce them and --

THE COURT:  And can you tell me which of your document requests these would be responsive to?

MR. HOFMAN:  Sure.  So there would be --

THE COURT:  And I'm looking at your exhibit --  well, we can do either Exhibit A or Exhibit G, 42, so either 42-2 or 42-8.  I don't think you reattached them --

MR. HOFMAN:  Sure.

THE COURT:  -- to your current motion but we have them in the record from a prior motion.

MR. HOFMAN:  So they would be, first, our request 44 which was requesting Nelms to produce all documents related to Jose Ortiz' investments.  It's been Nelms' position throughout this litigation that this Virginia land was an investment using Jose's funds, and so that request would encompass the refinancing of a loan on this land.

There was also request number 47, page ID I42, that asks Nelms to produce all documents discussing, referencing, or relating to the tree farm, and then there's also the

request 48 which is produce evidence sufficient to show Q-Consolidated of Virginia, LLC, purchased the tree farm, and there's also a request 49 which requested Nelms to produce evidence sufficient to show defendant has been the one paying the taxes and associated expenses for operation of the tree farm.

THE COURT:  Okay.  Anything else on the tree farm documents that you want to raise as part of your argument here?

MR. HOFMAN:  For them -- so those bank documents that we did receive showed that Nelms withdrew $30,000 in equity in the -- in this refinancing, and to date we still have no understanding and definitely no confirmation as to what happened with those 30,000 -- with that $30,000 withdrawal. Nelms says it went -- I think my understanding of what he says is it went to another company to repay -- to pay off a loan, but we don't have any documents to confirm that or to understand what exactly happened with that.

THE COURT:  Okay.  Anything else?

MR. HOFMAN:  And -- sorry.

THE COURT:  Mr. Hofman.

MR. HOFMAN:  And then the rest I've listed in my motion, you know, broke down specific payments, but it really all relates to the transaction records related to -- you know, who's been paying the loan payments, both the seller's note

that Mike Turner who sold the land to Nelms and also who's been paying this Virginia Bank and Trust, these payments, and, you know, we're just trying to understand where that money is coming from that's been paid because, you know, this land is still -- is still out there.  It's still -- it still has value, and if it's going to be Nelms' position that he owns part of this investment and that Ortiz owns part of this investment, then, you know, it is for us to figure out how much each party owns, if anything.  We need to know what payments have been made and who's making them, and we can't just take Nelms' word for that, we need the documentation of that, and in their response Nelms -- all he says -- he lists some documents that we produced related to it from -- through subpoenas that we sent, and that certainly does not meet his obligations under the discovery rules or this Court's order.

THE COURT:  All right.  Mr. Majewski, so let's start with this particular issue, your response.

MR. MAJEWSKI:  All right.  There's a lot to unpack here.  So, we produced documents relating to the Virginia tree farm before the motion to compel.  That was produced months before the motion to compel.  My recollection is that there was not a subpoena sent to Virginia Bank and Trust.  It was Herman called me one day and said, hey, I talked to -- I think it was Gary Hall or whoever was the resident agent, he told me about this information, Herman said, I called the bank, the

bank said, yeah, we have these documents, just tell Nelms to call us and we'll give it to them, and Herman said, do I need to send a subpoena?  I said, no.  If it's that simple, let me talk to Nelms, we'll get you the documents, which is what happened a week later.

THE COURT:  Well, the question, though, is, you know, why wasn't this produced in response to the initial document request?  What is the -- I mean, what -- the tree farm that supposedly Mr. Ortiz' money was invested in, it's clearly relevant, right?  Why is it that they're having to go dig for documents that your client then is able to produce after a phone call?

MR. MAJEWSKI:  So, for one, it wasn't Ortiz' funds that were invested.  He invested in a company, the company made the investment, so it's not about his funds being personally invested.  There --

THE COURT:  Okay.  But we've been through this, right?  The whole point of this is that he invested money and wants to know where the money went because it didn't come back to him and that's the -- that's the -- you know, the basis of the lawsuit, right?

MR. MAJEWSKI:  And in accordance with my representation to the Court the last time we were here, I didn't have those documents.  I wasn't even aware that they existed.

THE COURT:  So there -- so this has become kind of an issue between what you have and what your client has, right, and I think that was your statement a lot at the last hearing was, I don't have the documents, I don't have the documents. The trouble is it's not really -- it doesn't really matter what you have, it matters what your client has and whether or not he's producing the documents that are requested, and it seems to be that he doesn't produce stuff until people ask the direct question, and that's not his obligation or, frankly, yours as his attorney.  His obligation is to respond appropriately to the discovery requests.

MR. MAJEWSKI:  And I believe as far as he was aware he produced everything that was in his possession, custody, or control, and with respect to documents sufficient to prove the purchase, we provided those documents.  About the refinance, they say that this was a surprise.  I referenced the phone call transcript that they provided to us where my client told his client about the refinance and about Virginia Bank and Trust, so none of this can come as a surprise.

THE COURT:  So, hang on.  So document request number 44 asks for -- produce all documents relating to Jose Ortiz' investments that are the subject of this lawsuit.  Now, I suspect that your response to that is his investment was in MGMC and not further down the road, but we talked about this the last time, right, that defendant -- or plaintiff, excuse

me, is entitled to documentation of where the money went, and this strikes me, given that the defense's response has been one of the investments was this tree farm, I mean, this strikes me as pretty central to those allegations.

MR. MAJEWSKI:  I'm still wondering at this point what exactly relating to the tree farm he does not have.  I mean, he got all the records that we received from Virginia Bank and Trust.  This note that he's talking -- or this $30,000 in equity that he's talking about that he has no documentation for, that's false.  We gave them the note that supported the $30,000 repayment on that loan.  Yes, we did.  We absolutely did, and to the extent that he has these line items in his motion, Your Honor, I'm aware of no documents in discovery that lay these out like this.  I can think of one place where that information came from, and it wasn't anything in discovery.

THE COURT:  So, I'm still curious, though.  I mean, they call you and say, hey, what about this, and immediately the documents get released -- or some of the documents get, then, produced.  Why hasn't this -- why wasn't the request made to your client -- or maybe it was -- but why isn't your client producing these documents before they have to discover it through -- you know, down the road?  I mean, we're now -- you guys are past the close of discovery and we're still hashing out these issues where your client apparently had

documents that weren't produced.

MR. MAJEWSKI:  Discovery is still open, Your Honor. It was actually just recently extended again.

THE COURT:  Okay.

MR. MAJEWSKI:  And as far as I'm aware, I can't speak for my client, he's not here, but he gave me -- according to him he gave me everything he had or was aware of, and I did the same, and when it was brought to my attention there were additional records, we went and got them.  We didn't force them to send a subpoena or anything like that.

THE COURT:  Mr. Hofman, you're saying you sent a subpoena?

MR. HOFMAN:  I did send a subpoena, Your Honor, just because, again, we -- given everything that has happened we can't take Nelms at his word and so we wanted to make sure the bank gave us everything they had, everything that existed, and that we weren't relying on Nelms, and that's been the story in this case is we can't rely on his word, on Nelms' word, and that's what we have to send, 26 subpoenas for all these documents.  It's for -- a lot of these are account statements that Nelms -- where Nelms' name is on the account, but he's not -- he doesn't give us the account statements and so we have to go to the bank themselves, and that's 26 subpoenas we've had to send to various entities to get these statements that we then later find out Nelms actually has his name on and

so obviously he has access to these documents, and that was the same thing with the Virginia Bank and Trust.

MR. MAJEWSKI:  And plaintiffs name was on many of these accounts as discovery has shown.  Discovery has shown that he had access to Bank of Texas.  Discovery has shown his name was on Consumers Credit Union.

THE COURT:  Let's focus on what's at issue in the actual motion here.  I think I have a good understanding of this one, and I do note that discovery has been extended to July 29th, but, still, you know, we're shortly -- 17 days out from a discovery deadline.

At this point, Mr. Hofman, as to this, what is it that you think has not been, if anything, produced related to this transaction?

MR. HOFMAN:  One, Your Honor, is the -- Nelms' initial contribution.  He said he made an initial contribution to Q-Consolidated of Virginia, and that is on discovery -- on documents that we have obtained through discovery, and so the illusion here that we're getting this information through other routes is not true, and so we want to know if he made that initial contribution, let's see the records of that. They don't have any records except for a document that says Nelms made an initial contribution of 60,000 to Q-Consolidated, so that's one.

Two is the $30,000 withdrawal in equity.  There is a

note that covers that but that -- again, that's just a note that Nelms wrote.  We don't have the -- we don't know what -- what entity this money was sent to.  We don't have the transaction records.  Again, its something Nelms says but then he doesn't back it up so we want to have discovery -- we want to have documentation of that, and then the other -- there's also a statement that he made $15,000 -- he paid $15,000 on the principal on the seller's note for the Virginia forest land.  We don't have any documentation of that.  He's got tons of entities out there that each have their own bank account, and without knowing where these all are and where these bank accounts are, we simply can't -- our expert can't figure out did it actually happen or did it not happen.  We can't confirm it, and that's what discovery, obviously, is supposed to do.

THE COURT:  All right.  Mr. Majewski --

MR. MAJEWSKI:  Your Honor --

THE COURT:  -- if you have any suggestions about the best way to get to the point where --

MR. MAJEWSKI:  Well, I'm at a loss at this point because the items he's going through right now are a copy and paste job from something that we provided in the context of mediation.  No where else have these statements been made.

THE COURT:  I don't know why that matters at this point.

MR. MAJEWSKI:  Because these statements that were

made were covered by the mediation privilege.  I told Herman that he could use the exhibits that we attached but not the summary that we put together which these are copied and pasted from.

THE COURT:  Okay.  Well, if you provided factual information to him as part of discovery, whether or not -- I mean --

MR. MAJEWSKI:  It wasn't in discovery, Your Honor.

THE COURT:  Okay.  But why -- if it wasn't provided in discovery, why wasn't it provided in discovery?

MR. MAJEWSKI:  No, no.  The documents were provided in discovery but --

THE COURT:  Okay.

MR. MAJEWSKI:  -- my summary that I put together to help facilitate a resolution of this matter in mediation, that was not produced in discovery because it was in the context of mediation outlining for them our position in terms of where money in, money out was and what the appropriate resolution should be in terms of dollars and cents.

THE COURT:  Okay.  Well, but if that's your argument and that's information that was produced in discovery -- the underlying information was produced in discovery, there's no reason why he can't say, okay, well, if their claim is -- you know, they made an initial contribution of $60,000, there was a $15,000 payment, if that information is in the discovery,

the fact that you are making that allegation, it doesn't make it somehow privileged just to use it in mediation or to talk about it in mediation.  That's your position in the lawsuit, so what is -- what is the -- I mean -- hang on a second.  If that's the essence of your theory of the case, then that's exactly what they're entitled to try to figure out as part of the lawsuit, right?  So why are we going back and forth about documenting that information?

MR. MAJEWSKI:  Because they're asserting that this information was specifically previously requested in this form, and it was not, notwithstanding they have this information.  Like, number two, the $15,000 payment on the seller's note, I pointed out specific Bates stamp numbers that --  in documents that were produced that shows the copies of the checks of these payments being made.

THE COURT:  All right.  You did provide that in your response, I believe, and Mr. Hofman --

MR. HOFMAN:  The $15,000 payment, Your Honor, I've gone through each of the Bates stamps that they list, which by the way are all Bates stamps of documents we produced, not Helms, and the $15,000 payment and initial principal, I did not find any document that transaction record -- record of a bank that shows that.  The same is true for the $30,000 that was withdrawn in equity.  I have not seen and they don't list any in their response that would give us confirmation as to

the source of funds for that, who it went to, whether it actually happened, and the same goes for the other one I just listed.

MR. MAJEWSKI:  And I don't believe it's my obligation to cite these pages on the records for him if he can't find them.

THE COURT:  It is your obligation to produce documents that are responsive to document requests, however, and it is concerning to the Court that this information hasn't been produced when, you know, a little bit of digging results in additional information coming out that hasn't been produced that is apparently within your client's control.

MR. MAJEWSKI:  These documents were produced, Your Honor.  These were --

THE COURT:  He's saying that he produced them, or you're pointing to his --

MR. MAJEWSKI:  Pursuant to his subpoena because we didn't have those record.

MR. HOFMAN:  Your Honor, just to clarify, the three things I mentioned earlier in this hearing, the initial contribution, the $60,000 initial contribution, the $15,000 payment in initial principal, and the $30,000 withdrawal, there are no documents that I have seen in their production and there were also no documents in our production that would explain to us whether these were made and whose funds were

used for these payments for these contributions.  I have not -- and their response doesn't list any, so if they can point me to Bates numbers, I'll gladly look at them, but I have -- there are none.

MR. MAJEWSKI:  That's three out of the eight items he listed in his motion, Your Honor.  Three out of eight.

THE COURT:  Okay.  But the point of his motion was your client has documents he's not producing in response to document requests.  I didn't -- you kind of went off in this red herring in your response, Mr. Majewski, which I really didn't understand but I'm maybe starting to understand a little more why you thought that was the way to go, but the point of the motion is this is all stuff that -- Mr. Nelms was the person who was doing the refinancing so how is it that the plaintiff is having an easier time getting access to the documents than Mr. Nelms is?

MR. MAJEWSKI:  I don't understand how he'd have an easier time.

THE COURT:  Well, if he's the person that's actually in charge of the company that's doing the refinancing, wouldn't you expect that he would have the records as opposed to having -- the plaintiff having to get them from the -- which bank was it, the Virginia Bank and Trust?

MR. MAJEWSKI:  That might be the expectation, but that wasn't reality, Your Honor.

THE COURT:  And why is that?

MR. MAJEWSKI:  I don't know the answer to that, Your Honor, but as soon as it was brought to our attention I got the documents and I produced them.

THE COURT:  Okay.  But where did you get the documents from?

MR. MAJEWSKI:  I called the gentleman that Herman directed me to at the bank.  That's actually not true.  I called my client and said, call this gentleman at Virginia Bank and Trust and request these documents --

THE COURT:  Okay.

MR. MAJEWSKI:  -- and whenever I got them, a day or two later I forwarded them on to Herman as he requested.

THE COURT:  So you can imagine my puzzlement here, right?  If you were dealing with someone on the other side of a lawsuit who basically said, I have no records, I don't keep records -- I mean, essentially that's what -- the impression I'm getting of your client, right, is that if the bank has them, great, but the minute they come into my possession, they're gone, I don't have anything, so that's a strange way to run a business.

MR. MAJEWSKI:  I'm not going to disagree with you, Your Honor, but it's not as if we didn't produce any documents.  We produced thousands of pages of documents, all be it a small stack was missing that was still at the bank.

When it was brought to our attention we obtained them and produced them.  That's all that happened.  The settlement statement, the original purchase documentation, all of that stuff was produced long before the motion to compel.

THE COURT:  Has Mr. Nelms been deposed yet?

MR. MAJEWSKI:  No.

MR. HOFMAN:  I'm actually taking his deposition tomorrow, Your Honor.

THE COURT:  Okay.  You know, it strikes me that at several points in reading the parties' motions, I will just tell you, Mr. Hofman, there was sort of a step missing which normally would happen which is that there was some deposition testimony of the custodians where the question was asked, and normally I would see that before a motion for sanctions was brought, and I do -- I am sort of curious about that piece of this.  I mean, you've heard now Mr. Majewski's response.  I share your -- obviously, your concerns and I share your skepticism about the manner in which documents apparently were kept by the defendant in this case, particularly given some of the other allegations in the case, but we don't actually have that part of what I would normally see in a motion for sanctions, so -- go ahead.

MR. HOFMAN:  I would be happy to supplement the record with the transcript of his deposition.  I think, as I mentioned at the motion to compel hearing, you know, I always

like to have all the documents before I take someone's deposition especially --

THE COURT:  Of course.

MR. HOFMAN:  -- in a case like this where we are dealing with a -- you know, someone who has been convicted of fraud crimes before, because that's ultimately where this case goes to.  The truth is in the documents, so I would love -- I always like to have them before the deposition and I don't like to have to -- that was my thinking there, and I don't like to waste time during deposition asking discovery -- these types of questions, but I will certainly -- I obviously plan to do so, and I would be happy to supplement the record of this motion with the transcript of his deposition.

THE COURT:  The second question related to depositions -- I mean, the same thing really went as to the CPA firm.  It struck me that that was also -- we can just skip ahead to that.  That was also something that was concerning to me was that -- particularly your footnote, I think, about the emails that were produced but the fact that none were produced that were between Mr. Nelms and Mr. Stawick, and my question for you there was going to be, has his deposition -- or, I'm sorry, I guess I shouldn't say his for sure.  I don't know if Stawick is male or female, but has that deposition been taken -- taken place yet?

MR. HOFMAN:  I have not taken Mr. Stawick, Jim

Stawick's deposition yet, and, yeah, there again, I can take it. I guess I haven't decided whether I want to, but I thought the issues there were really clear cut, Your Honor. You know, again, it's their defense in this case both at the motion for judgment on the pleadings, during that -- and Judge Jonker also mentioned at the hearing, it's their position that my client's funds were invested in MGMC, LP, so we've asked them to produce the financials of this company, produce the statements. We have none of that, and so the issue there is, you know, if the -- are these -- if they're not legitimate companies -- so either they're -- they're not legitimate companies or they're disobeying the Court's order here.

Stawick has been Nelms' accountant for, I think, nine years, maybe more, and they can't produce a single e-mail between Jim Stawick and Nelms? Not a single one, and instead they do produce emails where my client is copied on it or emails between Stawick and Jose Ortiz himself, but we don't have any of the -- you know, no balance sheets, income statements, cash flow statements, any financials related to MGMC, LP. We also don't have any related to Q-Consolidated of Virginia. We have maybe two -- two financial statements related to Q-Consolidated, Inc., so either these aren't legitimate entities or they're withholding documents or both, and it just simply -- it's beyond belief that there won't be a single e-mail that either their accountant doesn't have it and

Nelms somehow doesn't have it?  I mean, it just doesn't make sense, Your Honor.

THE COURT:  You haven't, though, filed a motion to compel as to -- I know you filed it related to the motion to quash where you dealt with -- responded to -- I think that was the motion to quash which was as to -- one of them was to this entity, but you haven't moved to compel, although they presumably made what production they did make some time ago.

MR. HOFMAN:  Your Honor's order -- the March 24, 2022, order states that Stawick CPA Group is ordered to produce documents responsive to this subpoena by April 29, 2022 --

THE COURT:  Right.

MR. HOFMAN:  -- so they were under a Court order which was served on them to produce these documents.

THE COURT:  Yeah.  I mean, there are some times debates, though, around what is responsive to this subpoena, right, and I don't know that we entirely flushed that out as part of the last motion hearing.  I think I was, you know, fairly clear in terms of requiring the production.  I also think I made a ruling on any accountancy privilege.  We had a discussion and I think I even offered to stay the order if Mr. Majewski wanted to appeal my determination that federal law applied on that issue, which I don't think he did, so, you know, the next step, I think, isn't a motion for sanctions.

It's probably a motion to compel as to Stawick Group, so --

MR. HOFMAN:  Your Honor, if I can mention one thing?

THE COURT:  Sure.

MR. HOFMAN:  We also requested all of these documents from Nelms himself, and those are requests 19 through 21, 24, 36 through 42, and he says he's the owner of these -- of this company.  He was the one that manages these companies, and I think it's back to Your Honor's prior question again, where are these documents?  Why hasn't he produced them?  The attorney has been in contact with Jim Stawick before.  He's still Nelms' accountant.  Why can't -- has he not called -- you know, he can call the bank but he can't call Jim Stawick to produce them?  Even for this year, it's unbelievable that Nelms himself can't produce these, hasn't produced these.

THE COURT:  All right.  Thank you.  Let's let you be heard on this one, Mr. Majewski.

MR. MAJEWSKI:  What's unbelievable is, for example, emails and text messages between the parties.  They demand that we have them yet they don't but somehow by default we have to have them.

THE COURT:  I'm sorry.  So, again, is your response to this simply my client doesn't keep anything?  And -- because it is not surprising or -- I share Mr. Hofman's suspicion that there were emails back and forth, that there are emails that include Nelms, Ortiz, and Stawick, but then

you haven't produced anything that is a communication between Nelms and Stawick, right?  That does shrink credulity that that doesn't exist.  Now, if your response is simply my client keeps nothing and has not kept anything over the years, then that's your response, but is that what you're actually asking the Court to take from this?

MR. MAJEWSKI:  Yes, Your Honor.  I produced everything that I have.

THE COURT:  Okay.  I'm not asking, though, what your -- we're asking what your client has.

MR. MAJEWSKI:  Well --

THE COURT:  Does your client understand his obligation --

MR. MAJEWSKI:  Yes.

THE COURT:  -- and has he searched?

MR. MAJEWSKI:  That's my understanding, hence his affidavit attached to the response, although I think the affidavit was specifically limited to communications between the parties.

THE COURT:  Yeah.  I don't remember it being that broad.

MR. MAJEWSKI:  And to the extent that -- I mean, I believe Mr. Ortiz would also theoretically be a client of Mr. Stawick.  Actually, I believe he was a client.  I think he did his individual tax returns and also would be likely entitled

to the other entity tax returns to the extent he had an ownership interest in them through his investment in MGMC.

MR. HOFMAN:  One other point, Your Honor, beyond the issue we already discussed.  We did send a subpoena to another individual who was paid by Nelms using Ortiz' funds and his name is Gregg Kippers, and Nelms there, too, produced some emails between himself and Gregg Kippers but then others that we later obtained from Gregg Kippers himself, which were, in my opinion, incriminating, were not produced by Nelms, so there's just another example where it's just strange -- you know, again, why were some emails produced but not the incriminating ones?

THE COURT:  I mean, the trouble you have, Mr. Hofman, is that you have stated -- I would say, you know, in the criminal context we would call this reasonable suspicion, certainly, maybe even probable cause, but without having any cross examination of Mr. Nelms, which you're going to get to do, it's a little bit difficult to make a determination.  Some people don't -- you know, some people delete every e-mail that comes across their desk immediately as it comes through.  I don't know whether he does that or not, but, I mean, I agree with you, it is strange.  It also would be pretty strange for the Stawick Group to not have kept emails as part of their business given -- you know, it's like lawyers, right, they have to continue to -- or they have to keep information that

they receive from their client.

So, what I don't have here, though, is I don't have the Stawick Group here so I can't inquire as to that.  I also don't have any information related to their -- what they've done to search for documents so it's a little bit difficult without some additional building of the record there to turn that reasonable suspicion into something more, or at least that's my view of it at this point.

Maybe it makes sense at this point to talk through some of the other issues so that both parties can fully understand what it is plaintiff thinks is missing as we move through the last part of discovery here, but my inclination at this point, I think, Mr. Hofman, is to let you have some time to build out your record a little bit further before making a determination here, and I don't know whether that means you'll want to file a motion to compel as to the Stawick Group or on any other topic, but I would suggest that it would be helpful to the Court to know a little bit more about what's going on here from actual witness testimony.

Okay.  So I think you had gotten to the -- well, you tell me, what remains that --

MR. HOFMAN:  Sure.  Yeah.  One of the other issues, Your Honor, and I know we spent a lot of time talking about this at the motion to compel hearing, too, are the -- Nelms listing the bank accounts under his control, and he provided

a -- there was an interrogatory number 23 that we served asking him to identify any and all bank accounts under his control, and he initially had refused to do that and so we brought the motion to compel, and we discussed that at the hearing and this Court ordered him to supplement his response to the interrogatory with a listing, and he did so, all be it 14 days late after the deadline that this Court had set, and gave us a list.

We attached that to our motion, and that's Exhibit K to our brief, ECF 69-12, page ID 914. And -- but then later through other subpoenas, other discovery we obtained we learned that he did not list all the bank accounts under his control. For one, there was a bank called Incredible Bank that he actually used to make payments on this Virginia Bank and Trust loan that is not listed on his response to the interrogatory. There's another bank account that I actually just learned about a few days ago, Loyola Federal Credit Union that apparently -- that's where Q-Consolidated had a bank account at some point in time. PNC Bank is another one that we learned Q-Consolidated had a bank account at, and those are not listed in his response, so, again, it's the issue here of Nelms not being truthful and even in his responses to our interrogatory -- and I know Mr. Majewski later emailed me when I inquired about that saying, oh, well, he forgot about it. I mean, this was -- Incredible Bank is a bank he was making

payments on until recently.  March 2022 he was still making payments from that bank account, so it's, again, an issue of Nelms not being forthright in discovery responses, and as Mr. Majewski agreed during the motion to compel hearing, you know, this is -- this is important information.  This is how -- how are we going to otherwise learn about these accounts?

THE COURT:  Mr. Majewski.

MR. MAJEWSKI:  I mean, I don't know what the basis is for him to assert that they were omitted.  I mean, what documentation or proof do we have that he was on these accounts, that he had control of them?  I mean, he listed one account in the motion, I believe -- where is that -- Tartessan Holdings, or whatever it's called.

THE COURT:  No, no.  We're talking about -- right now we're talking about Virginia Bank and Trust, which is now First National Bank, PNC Bank, and Incredible Bank.  This is on page seven.

MR. MAJEWSKI:  Right, which also lists Tartessan Holdings which he said that should have been listed on there and a bank account associated therewith, but there's no basis to say that he has an ownership interest in that company --

THE COURT:  That aside, we're still talking about the three bank accounts.  We can get to Tartessan Holdings in a minute, but are you suggesting that he does not actually have bank accounts at Virginia Bank and Trust, PNC Bank, and

Incredible Bank, or did not?

MR. MAJEWSKI:  Well, Virginia Bank and Trust Herman didn't just mention so I didn't know that this was one of these --

THE COURT:  It's listed on page seven of the -- of his brief.

MR. MAJEWSKI:  Virginia Bank and Trust is listed on the interrogatory response, Your Honor.

MR. HOFMAN:  The issue with that one, Your Honor, is he has multiple accounts at Virginia Bank and Trust.  One of them is listed on the interrogatory response.  The other that we learned about is not listed.

MR. MAJEWSKI:  I have no -- I don't know.  I don't know.  And I have no idea about these -- a Loyola Federal Credit Union or PNC Bank.  I have no -- I've never seen any documents or anything to say that there was ever an account there for an entity or for my client.

THE COURT:  All right.  Mr. Hofman, what is your basis for indicating -- I think you have it in your motion but let's just go through it for the record that you indicate looks like Cemetery Equity Solutions, so this is Exhibit D, right, that's the basis for the Incredible Bank account; is that correct?

MR. HOFMAN:  The Incredible Bank account, Your Honor, was -- those were records that we received from Virginia Bank

and Trust that showed -- and from Nelms.  They showed payments from Nelms on that refund -- on that loan from Virginia Bank and Trust, and all the way -- the most current payment that it showed by Nelms on this loan was made from Incredible Bank, and so obviously the question came to me, if he's making payments on this Virginia Bank and Trust loan from Incredible Bank all the way through March 2022, why isn't that bank listed on his response to our interrogatory?

THE COURT:  Mr. Majewski.

MR. MAJEWSKI:  I don't have an answer for you, Your Honor.  I'm looking --

THE COURT:  All right.  So that's the Incredible Bank.

MR. HOFMAN:  Yep.  And then a Loyola Federal -- there's another --

THE COURT:  And have you done -- I'm sorry, Mr. Hofman, before we move on from that, have you done a subpoena to Incredible Bank?  Do you have any additional information about that account at this point?

MR. HOFMAN:  I have not yet done a subpoena to Incredible Bank.

THE COURT:  All right.  So it's -- there's someone making a payment from Incredible Bank on the Virginia Bank and Trust loan to -- is it Cemetery Equity Solutions, that's the -- is that the -- my understanding -- is that the right

understanding of the situation here?

MR. HOFMAN:  There is -- Nelms is making these payments from Incredible Bank to --

THE COURT:  Well, what's your basis for saying that?

MR. HOFMAN:  He produced the documents to us.  The Virginia Bank and Trust documents were -- he also personally guaranteed this note.

THE COURT:  Okay.  But it's not clear to you, for instance, whether or not there's some affiliated entity that owns the -- that is the signatory on the Incredible Bank account that for some reason is paying from there?

MR. HOFMAN:  Right.  It might be one of Nelms' entities, sure, but I don't have the signature card of the Incredible Bank account.

THE COURT:  All right.  All right.  So that's Incredible Bank.  PNC Bank.

MR. HOFMAN:  That was -- I don't have the specific document.  I don't have the Bates stamp right now, but that was another bank that we came across.  Apparently it is in Q-Consolidated's name, and there was a bank account there.  Q-Consolidated is an entity owned, managed by Nelms, and we haven't received -- it wasn't, again, listed on his response to our interrogatory.

THE COURT:  And so -- and what is your basis for having -- believing that he has an account there?

MR. HOFMAN:  Well, Nelms is the one who owns Q-Consolidated, he manages it, and -- when it existed.  Again, we're not agreeing that it's even a legitimate entity, and so the bank account in Q-Consolidated's name, obviously Nelms would have information about it.

THE COURT:  Okay.  I guess what I'm asking is where is your documentation of that?  I just didn't see it --

MR. HOFMAN:  I didn't attach it to our motion, Your Honor, but it's a document that I came across in discovery, and I agree I did not attach it to the motion.

THE COURT:  Yeah.  I mean, obviously that's an important part of building the case if you have one for sanctions, right, is the actual underlying documentation as opposed to simply your statement there, and then the Virginia Bank and Trust, that's what we've been talking about, right?

MR. HOFMAN:  Right.  There is additional -- there was an additional account there, and I'm trying to pull up my -- one of the emails I sent lists the account number there.  I have to find it.  It's attached to our motion, but I don't remember which e-mail it was.

That was an account that we learned about, again, through production of documents from Virginia Bank and Trust. We learned there was another account in Nelms' -- that Nelms was making payments from that was not listed in the interrogatory response.

THE COURT:  And, again, that documentation, is that attached to your motion somewhere that I'm missing right at this moment?

MR. HOFMAN:  I'm trying to find the e-mail, Your Honor.  I apologize.

THE COURT:  But we don't -- just so that you can -- there was at least one deposition transcript that you attached to your motion that I don't think had the pages that you intended to attach to it.

MR. HOFMAN:  Okay.

THE COURT:  In the Biddle deposition, I think you had referenced pages that I don't think actually made it into the exhibit, so if I'm -- what I'm leaning toward here is adjourning this and giving you an opportunity to supplement those based on any upcoming depositions, any further discussion with the Stawick Group or motion to compel with the Stawick Group, and the -- if I'm doing that, then I'll also, obviously, provide you an opportunity to update the exhibits that you have that would support your motion.

I think that might also help with Mr. Majewski, because, you know, from his perspective he's got a client telling him, no, I don't have this.  Some of it, again, I think strains credulity to some degree, but it is without some of the documentation we've been talking about in this hearing, I think, more difficult to respond appropriately to that

motion.

Given that that is where we are, what else as you're going through your motion do we need to talk about on the record or have we pretty much gone through the items that you viewed as being the primary things that this Court should consider?

MR. HOFMAN:  Again, so as Your Honor mentioned, one of the other items was -- that was Mr. Biddle's deposition.  I took his deposition.  We learned during the deposition that he had -- at Nelms' request had sent a box full of documents, records related to MGMC, related to Q-Consolidated.  Those have been sent to Nelms' offices in Greenville, South Carolina, about two years ago, and we haven't received any of those documents.

What happened was Biddle and Nelms had a -- there was a lawsuit between them, and I think it was as part of the settlement of that lawsuit, that's what Mr. Biddle was saying, Nelms asked him to send all those documents to Greenville, South Carolina, and none of those have been produced to us.

THE COURT:  Again, so that reference is on page four of your motion, and you reference Exhibit E, but then you say it's at 139 -- page 139, line seven to 140, line ten, and those pages of the deposition are not attached in the exhibit that you provided.

MR. HOFMAN:  I'm just going over those pages right

now.

THE COURT:  You've got page -- you have the cover sheet of the deposition transcript, pages six, eight -- six, seven, eight, and nine, and then it skips ahead, at least in what I have, to 150, 151, 152.

MR. HOFMAN:  Yeah.

THE COURT:  It doesn't really cover pages 139 to 140.

MR. HOFMAN:  That --

THE COURT:  So, you know, to the extent you're making this argument that defendant hasn't appropriately responded to discovery, there are several places in the record where I can't quite -- you know, there's no -- the building blocks aren't there of your argument, so, as I said, what I'm inclined to do at this point is set this out for a period of time and let you supplement over the course of the last part of discovery here and then make a determination as to how best to proceed from there.

Mr. Majewski, I haven't given you a chance to talk in a little while.  Anything else you wanted to respond to from Mr. Hofman?

MR. MAJEWSKI:  No. I think I've -- I've made my record.  Hopefully, you know, after we flush this out a little bit more maybe we'll have some room for agreement on some of these issues and at least, you know, make it -- I'm sorry, we're boring you, Your Honor.

THE COURT:  You're not.  You're not boring me at all. I didn't mean to -- I'm just listening.  I was also going to make also the suggestion that to the extent there are -- Mr. Majewski, as this goes along you discover discovery issues -- I mean, you have a client here who may be -- may or may not be a difficult one to deal with.  I don't know.  And I would suggest that continuing to work with him over the next little bit is something that may help the parties come to a resolution of some of these issues, and I always appreciate that, because this is, as you can tell as an adjudicator, right, it is difficult to get through, as I said in the beginning, is all of the nitty gritty that the two of you know very well but what I've only seen little snapshots of as things go along.

I'll also note, Mr. Hofman, I'm not sure -- I guess one of the issues that we haven't talked about that is worth talking about is the documentation that you're seeking on their affirmative defenses, defendant's affirmative defenses relating to the set-offs.  You know, my initial take on that was more or less, well, if they don't produce the documentation then they don't get the affirmative defenses so it's almost in your best interest to -- you know, if they don't properly document it, they don't get it, so it's sort of self executing in terms of the sanction for that.

I know, though, that they have produced at least some

listing of payments that I think they're saying were relevant to this setoff issue, and maybe that's the argument that you are -- and I, of course --

MR. HOFMAN:  That's the issue, Your Honor.  Nelms, again, he drafts these documents that he then relies on but he doesn't give us the underlying transaction records and so that's --

THE COURT:  Right.

MR. HOFMAN:  -- what we're facing there.

THE COURT:  Yeah.  I mean, you know, that's a pretty good argument to the Court, though, too, that he has provided this list but hasn't provided any discovery related to the list.

MR. HOFMAN:  I just wanted to make the record clear on that, Your Honor, that we --

THE COURT:  Yeah.

MR. HOFMAN:  -- have done all we can to obtain those records.

THE COURT:  Got it.  And then in terms of some of the other adverse inference type sanctions that you've requested, in general courts tend to be pretty reluctant to order adverse inferences that don't specifically relate to the discovery issue that -- the discovery problem that is the issue, and I'm not going to give you any advance ruling on that, but just to give you a sense of -- when I was reading your motion, you

know, establishing a fact like the parties want a fiduciary relationship where Nelms' serves as Ortiz' investment advisor and manager, I don't know how after reading your motion or the response the documents that are at issue relate to that particular issue, and it would be difficult as a Court -- for a Court to make that kind of adverse inference ruling where it was not specifically tied to -- now, it's one thing to say Mr. Nelms hasn't produced the documents that would support his affirmative defense, right?  That's a pretty easy inference to draw if, in fact, that's true, and I'm not --  I don't mean -- Mr. Majewski is looking nervous.  I don't mean to -- I'm not necessarily making a ruling on that, but it's the types of things that one would -- that a Court would make as a sanction potentially would need to be identified pretty closely with the actual spoliation issue that is the issue, so, you know, if there's some company that no documents were related to, one might infer from that that that was because it was not a properly formed company.  Something like that would be more likely than the broader brush suggestions that are in your argument.

That said, I haven't made, as I said, any determination on any of it at this point as to what's appropriate here, and the parties continue to work through the end of discovery and then if you want to -- I think what I'd like to do is say we'll adjourn this for at least a month and

give you an opportunity to file any supplement -- let's see, your -- the end of your discovery period, I just looked it up again, is now the 29th of the month; is that correct?

MR. HOFMAN:  That's correct.

MR. MAJEWSKI:  Yes.

THE COURT:  All right.  So just looking at your calendar, dispositive motions are then due a month later. Let's make any supplemental filing related to this -- if we do 14 days after the close of discovery is that sufficient time or do you want it to be out longer, Mr. Hofman?  It's up to you.  I mean, obviously this -- to the extent there are discovery issues out there you may need to file motions to compel separately and maybe the sanctions part of it you want more time rather than less, but I will give you the opportunity to say what schedule you think is appropriate here.

MR. HOFMAN:  Yeah.  And, of course, Your Honor, that's a little hard to say at this point given -- given Your Honor's direction on -- you know, in taking the -- I'm taking the deposition tomorrow, but I think --

THE COURT:  The other option is I can deny it without prejudice and you can refile.

MR. HOFMAN:  If we can adjourn for a month as Your Honor mentioned and then 14 days, so just so I'm understanding correctly, we would adjourn the hearing for one month and then

when would the opportunity to file supplemental --

THE COURT: Well, no, I wouldn't set a hearing until after I've had an opportunity to review supplemental briefing, so I think, you know, actually what probably makes the most sense here is to deny this without prejudice today and let you refile down the road given the underlying facts that need to be flushed out or may be flushed out, and you can certainly in a subsequent motion simply refer to the initial -- whatever you already filed with the Court. You don't have to refile all of that, but I think that would probably be the cleanest thing from the Court's docket at this point.

Anybody have any objection to that? I know Mr. Majewski doesn't, but anybody have any -- Mr. Hofman, do you have any objection to doing it that way?

MR. HOFMAN: Your Honor, I would like the adjourning it and filing a supplemental brief to supplement it later for what I understand --

THE COURT: Yeah. I think, though -- I think I have to -- I think I would have to make a finding on this based on what I have in front of me. We can do it that way, but it, frankly, doesn't make a lot of difference except from a Court processes perspective, and just the way that our -- our docket works, this is a simpler way for us to accomplish this from, again, the Court's perspective, so I think what I'm going to do is deny without prejudice today and then you can make a

determination as to when you want to or if you want to refile.

All right.  Mr. Majewski, again, you haven't said anything in a while.  Anything else you have to put on the record at this point?

MR. MAJEWSKI:  I try to keep my talking at a minimum, Your Honor.  No, thank you.

THE COURT:  That has not been my experience, actually, but --

MR. MAJEWSKI:  With me?

THE COURT:  All right.  Anything else we need to talk about today, Mr. Hofman?

MR. HOFMAN:  No.  I think that covers the items that we covered in our motion.  And just so I'm clear, Your Honor, we -- this Court is denying without prejudice to us refiling this, the motion, including after the close of discovery, correct?

THE COURT:  Correct.  Correct.

MR. MAJEWSKI:  I have nothing further, Your Honor.

THE COURT:  All right.  We'll be adjourned.  Have a good day, everybody.

MR. HOFMAN:  Thank you, Judge.

*(Whereupon, hearing concluded at 3:08 p.m.)*

*C E R T I F I C A T E*


         I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.




                        /s/ Genevieve A. Hamlin
                        Genevieve A. Hamlin, CSR,RMR, CRR
                        U.S. District Court Reporter
                        Lansing, MI  48933